UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 13-11574

NICHOLI ROGATKIN, Minor by His Father
and Next Friend, VLADMIR ROGATKIN[1]

v.

RALEIGH AMERICA INC./DIAMONDBACK BMX,
and JOHN DOES 1-8

MEMORANDUM AND ORDER ON DEFENDANT
RALEIGH AMERICA, INC.'S
MOTION FOR SUMMARY JUDGMENT

November 24, 2014

STEARNS, D.J.

Plaintiff Nicholi Rogatkin, a professional freestyle BMX (bicycle motocross) rider, alleges that defendant Raleigh America, Inc., a bicycle manufacturer and the sponsor of the Diamondback BMX Team, unfairly exploited his youth and inexperience during his 5-year stint as a rider for Team Diamondback. Discovery having been completed, Raleigh moves for summary judgment on all seven counts of the Amended Complaint. For the reasons stated, the motion will be allowed.

---

[1] Nicholi Rogatkin was a minor at the commencement of this lawsuit. As he has since reached his majority, the court will regard him as the proper plaintiff.

## BACKGROUND[2]

Rogatkin became an accomplished BMX rider at an early age. In 2007, at age 11, Rogatkin joined Team Diamondback. At the time of his enlistment, Rogatkin and Raleigh did not enter into any written agreement, nor did Rogatkin request or receive any monetary compensation from Raleigh.

While competing for Team Diamondback, Rogatkin used equipment provided by Raleigh and wore Raleigh's logo. Raleigh, in turn, used images of Rogatkin in its catalogs and advertisements,[3] and publicized Rogatkin on its diamondbackbmx.com website. A mini-biography of Rogatkin, published on the website until at least November of 2011, described Rogatkin as 12 years old, 4 feet 10 inches tall, and sporting the monikers "little dude" and/or "little kid." The website featured several photographs of Rogatkin performing tricks on a 16-inch bicycle, *see* Pl.'s Opp'n Ex. Q, and included a link to Rogatkin's personal Youtube page.

---

[2] The facts are viewed most favorably to Rogatkin as the nonmoving party.

[3] In 2008, Raleigh paid for Rogatkin to travel to and from a photo shoot, where photos of Rogatkin were taken for Raleigh's catalog. Raleigh also furnished Rogatkin a new bicycle expressly for the photo shoot.

Periodically, Rogatkin sent photos, videos, and biographical information about himself to Raleigh for use on the website. Rogatkin complained on occasion that Raleigh was giving him too little attention on the website. He also repeatedly asked Raleigh to update his biography and photos to reflect his coming-of-age, and particularly his switch t0 bigger bicycles.[4] Raleigh, however, delayed in doing so because it used Rogatkin's image to promote sales of its 16-inch bikes.

Sometime in 2009 and 2010, Rogatkin broached the topic of compensation with Raleigh for his efforts on behalf of Team Diamondback. Although Raleigh stated that it would only consider limited financial support for the time being, it hinted at a bright future for Rogatkin. Rogatkin relates several oral and email[5] conversations with Raleigh representatives Mike Hammond, Trevor Knesal, Sharon Robinson, and Kristian Jamieson[6] in which he was assured that he would receive "greatly

---

[4] Rogatkin began competing on an 18-inch bike in 2009. He first competed on a 20-inch bike in 2010, and by 2011 was competing exclusively on 20-inch bikes.

[5] Rogatkin believes that certain of these emails have been deleted from his account.

[6] Jamieson was not employed by Raleigh. He rather served as athletic manager for TAOW Productions, LLC and Windells Camps/NW School of Freeride, the promotors Raleigh had contracted to manage Team Diamondback through June of 2009.

3

increased support," that he had a "green light" to feel optimistic about his career at Team Diamondback, and that he could look forward to a "golden life" if he stayed with Raleigh. Rogatkin Dep. at 39:19-23; 108:15-17; & 71:11-22.

In 2010, Raleigh agreed to provide Rogatkin with a $2,000 travel budget.[7] In June of 2011, Rogatkin and Raleigh executed a Diamondback Team Rider Sponsorship Agreement effective from April 1, 2011 to March 31, 2012.[8] The Sponsorship Agreement provided that Rogatkin would receive a monthly retainer of $416.66, and up to $5,000 in result-based incentive bonuses from Raleigh.[9] Rogatkin Dep. Ex. 8 at Addendum A. In return, Raleigh was permitted to make unlimited promotional use of Rogatkin's name and likeness. *Id.* ¶ 2.

Rogatkin left Team Diamondback in June of 2012.[10] While still at Team Diamondback, Rogatkin was approached by Bulldog Bikes (in 2009),

---

[7] Rogatkin invested substantially more than $2,000 to travel to competitions with his father.

[8] Rogatkin's father, Vladmir Rogatkin, signed on Rogatkin's behalf.

[9] It is undisputed that Rogatkin received the full amount he was entitled to under the Sponsorship Agreement.

[10] Rogatkin made the following public statement concerning his departure from Raleigh.

4

DK Bikes (in 2010), and KHE (in 2011), with sponsorship nibbles. Out of loyalty to Team Diamondback, Rogatkin did not pursue any of these overtures.[11] After leaving Team Diamondback, however, Rogatkin became a fulltime rider for KHE. At present, KHE pays Rogatkin a $30,000 annual salary and $8,000 in travel expenses. On or about June 6, 2012, Raleigh removed any references to Rogatkin from the Team Diamondback webpage.

Rogatkin brought this lawsuit in Middlesex Superior Court in May of 2013. The Amended Complaint lists seven counts: unauthorized use of name and portrait or picture in violation of Mass. Gen. Laws ch. 214 § 3A (Count I); unfair and/or deceptive business practices in violation of Mass. Gen. Laws ch. 93a, §§ 2 & 11 (Count II); defamation (Count III); negligent misrepresentation (Count IV); unjust enrichment (Count V); promissory

---

> After five great years, I am sad to say I'm leaving Diamondback. I've had the best time with the company and with my forever teammates. I want to especially thank Trevor Knesal, who signed me on to the pro team when I was only 11 and sent me on the best trips and the biggest contests around the world. However, a great opportunity has come up for me outside of DB and I will keep you guys updated when it's final. Thanks again to everyone at Diamondback.

Rogatkin Dep. Ex. 6.

[11] Rogatkin began promoting Kali Protectives and Monster Energy in 2009. Both Kali and Monster have provided Rogatkin with travel expenses. Rogatkin began a limited relationship with KHE in 2011.

estoppel (Count VI); and intentional misrepresentation (Count VII). Invoking diversity jurisdiction, Raleigh removed the Complaint to this court in July of 2013. Raleigh filed its motion for summary judgment in July of 2014, following the completion of discovery.

DISCUSSION

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one which has the "potential to affect the outcome of the suit under applicable law." *Nereida-Gonzalez v. Tirado-Delgado*, 990 F.2d 701, 703 (1st Cir. 1993). For a dispute to be "genuine," the "evidence relevant to the issue, viewed in the light most flattering to the party opposing the motion, must be sufficiently open-ended to permit a rational factfinder to resolve the issue in favor of either side." *Nat'l Amusements v. Town of Dedham*, 43 F.3d 731, 736 (1st Cir. 1995) (citation omitted).

*Defamation (Count III)*

Rogatkin alleges as defamatory Raleigh's repeated publication of a biography characterizing him as a 12-year old "kid" and of photographs

depicting him as a 16-inch bike rider.[12]  To prove defamation, a plaintiff must establish that "the defendant was at fault for the publication of a false statement regarding the plaintiff, capable of damaging the plaintiff's reputation in the community, which either caused economic loss or is actionable without proof of economic loss."  *White v. Blue Cross & Blue Shield of Mass., Inc.*, 442 Mass. 64, 66 (2004); *see also Phelan v. May Dep't Stores Co.*, 443 Mass. 52, 56, (2004).

A false statement is defamatory if it "would tend to hold the plaintiff up to scorn, hatred, ridicule or contempt, in the minds of any considerable and respectable segment in the community."  *Phelan*, 443 Mass. at 56.  "[W]hether a communication is reasonably susceptible of a defamatory meaning [] is a question of law for the court."  *Id.*  "The court [must] examine the statement in its totality in the context in which it was uttered or published.  The court must consider all the words used, not merely a particular phrase or sentence."  *Amrak Prods., Inc. v. Morton*, 410 F.3d 69, 73 (1st Cir. 2005).

The publication of Rogatkin's age (12) and characterizing him as a "kid" in a biography is no more susceptible to a defamatory meaning than

---

[12] Although Rogatkin admits that the accused material was accurate and non-defamatory when published, he contends that as he grew in age and skill, his static portrayal by Raleigh took on a defamatory undertone.

7

biographical references to Ambassador Shirley Temple as a child actor or as "America's Little Darling." A defamatory statement must be false. There is no dispute that Rogatkin's biographical details were accurate when initially published (Rogatkin supplied Raleigh with the biography). The publication of true but historical facts (even if outdated) about a person cannot be defamatory as a matter of law. A biography, like a photograph, is a faithful snapshot of a person taken at a particular time in his or her life. Although Raleigh did not update Rogatkin's biography with the march of time (the court knows of no duty the law imposes to do as much), it published Rogatkin's accurate date of birth on the same page – a reasonable assurance that the public would never confuse Rogatkin with, say, Peter Pan or Benjamin Button.

By the same principle, the authentic photographs of Rogatkin performing and riding on a 16-inch bike are also not reasonably capable of a defamatory meaning. Although photographs may take on a defamatory cast if published in a demeaning or derogatory context, *see, e.g.*, *Stanton v. Metro Corp.*, 438 F.3d 119, 125-129 (1st Cir. 2006) (concluding that photograph of high school student juxtaposed with article on teenage sex was reasonably susceptible of defamatory meaning), or manipulated as in Soviet days to depict something other than reality, there is no suggestion

that Raleigh published photographs of Rogatkin that lent themselves to any interpretation other than that he was an accomplished 16-inch bike rider.[13] Because the accused publications are not reasonably susceptible for defamatory meaning, Raleigh is entitled to summary judgment on Count III.

*Unauthorized Use of Name and Portrait/Image (Count I)*

Rogatkin alleges that because no written contract governed his relationship with Raleigh outside of the April of 2011 to March of 2012 Sponsorship Agreement, Raleigh's use of his name and image on its website and in its catalogs and other advertising violates Chapter 214, Section 3A of Massachusetts General Laws. Section 3A grants a right of private action to "[a]ny person whose name, portrait or picture is used within the commonwealth for advertising purposes or for the purposes of trade without his *written consent* . . . to prevent and restrain the use thereof; and [to] recover damages for any injuries sustained by reason of such use." (emphasis added).

---

[13] Rogatkin alleges that Raleigh's continued publication of images of him as a 16-inch bike rider led to ridicule and scorn because he was not shown riding a larger bike. This is not an objection to the publications, but to the *lack* of publication of photos showing Rogatkin riding larger bikes. Rogatkin has not identified any support for the novel proposition that the absence of publication may form the basis of a defamation claim.

Raleigh contends that Rogatkin's email communications constitute sufficient written consent because Section 3A does not require that written consent be memorialized in any particular format. *See, e.g.*, Rogatkin Dep. Ex. 12 (3/10/2007 email from Rogatkin to Knesal) ("Trevor, whatever you're saying in your letter – make a frame for me?!!, having me in a Diamondback Catalog?!! already sounds like a dream come true. What can I do for Diamondback?"). Moreover, Rogatkin does not disagree that he condoned Raleigh's use of his name and images for purposes of advertising at the time of publication, or that he attended the various photo shoots (such as the one in Seattle in 2008) with any expectation other than that his name and image would be used by Raleigh to promote sales of its bikes. Rogatkin supplied Raleigh photographs and videos of himself for use on the Raleigh website over the course of his career at Team Diamondback, and if he complained of anything, it was that Raleigh was posting too few of his feats.[14]

---

[14] Section 3A protects "the interest in not having the commercial value of one's name, portrait or picture appropriated to the benefit of another." *Tropeano v. Atl. Monthly Co.*, 379 Mass. 745, 749 (1980). As the title of Section 3A makes clear, that interest is infringed only when the use is "unauthorized." To protect the interests of the parties, consent is optimally memorialized in a written instrument. However, at common law, consent may be given orally or through a course of conduct. Although the language of Section 3A references "written consent," nothing in the statute suggests a

Even if the court were to adopt Rogatkin's argument for purposes of summary judgment, that his enthusiastic emails, voluntary participation in the production of his images, and his condonation of their publication are insufficient to satisfy the formalities of the "written consent" required by Section 3A, Rogatkin cannot show any *personal* damages resulting in Raleigh's use of his image in its advertisements. His complaint rather is that Raleigh benefitted more from the sales of bikes generated by his image than he did from the exposure. The court knows of no theory of quasi-contract (other than unjust enrichment, *see* discussion of Count V *infra*) that would permit a party to recoup the benefits that the other acquires from an otherwise consensual relationship.[15] Moreover, the only evidence that Rogatkin submits in support of the claim that Raleigh benefitted disproportionately from the association – a chart showing Raleigh's total sales of 16-inch and 18-inch bikes from October of 2008 to September of

legislative intent to displace common law or the equitable defenses of acquiescence and waiver.

[15] Rogatkin's testimony that Raleigh treated other riders more generously is inadmissible hearsay, and at best, simply evidence that other riders struck more advantageous bargains with Raleigh (as Rogatkin later did with KHE). So too with Rogatkin's complaint that he suffered harm from his failure to pursue sponsorships with other bike companies because of his loyalty to Team Diamondback. There is no evidence of the terms of any concrete competing offer that Rogatkin received and rejected, or any evidence that Raleigh forbid or restrained Rogatkin from entering a relationship with another team or bicycle manufacturer.

2013 – offers no basis on which a finder of fact could determine what, if any, percentage of these sales is reasonably attributable to the use of Rogatkin's image in Raleigh's advertising "in the commonwealth" (or anywhere else). *See Bonacorso Const. Co. v. Master Builders, Inc.*, 1991 WL 72796, at *10 (D. Mass. Apr. 24, 1991) ("The plaintiff has not demonstrated that it will be able to analyze this data [of variable year-to-year sales in Massachusetts] to prove by a preponderance of the evidence that any of the amount of the increase was due to use of its name and likeness.").[16] Because Rogatkin has adduced no material evidence of damages attributable to the use of his name and image, Raleigh is entitled to summary judgment on Count I.

*Intentional/Negligent Misrepresentation, and Promissory Estoppel, (Counts IV, VI, and VII)*

Rogatkin's claims of intentional and negligent misrepresentation and promissory estoppel also fail for the lack of any evidence of damages. "To sustain a claim of misrepresentation, a plaintiff must show a false statement of material fact made to induce the plaintiff to act, together with

---

[16] Raleigh also contends that its use of Rogatkin's name and images for advertising was not "within the commonwealth." It is undisputed, however, that Rogatkin's rider page, featuring his biography and photographs, was accessible in Massachusetts over the internet. Moreover, advertising for Diamondback featuring Rogatkin appeared in BMX magazines that circulated in Massachusetts. *See* Rogatkin Dep. Ex. 10.

reliance on the false statement by the plaintiff to the plaintiff's detriment. . . . The speaker need not know 'that the statement is false if the truth is reasonably susceptible of actual knowledge, or otherwise expressed, if, through a modicum of diligence, accurate facts are available to the speaker.'" *Zimmerman v. Kent*, 31 Mass. App. Ct. 72, 77 (1991), quoting *Acushnet Fed. Credit Union v. Roderick*, 26 Mass. App. Ct. 604, 605 (1988)). "Where a plaintiff does not prove that he is worse off than if there had been no misrepresentation he has not made out a case of deceit." *Connelly v. Bartlett*, 286 Mass. 311, 315 (1934). To prove a claim of promissory estoppel under Massachusetts law,

> a plaintiff must allege that (1) a promisor makes a promise which he should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee, (2) the promise does induce such action or forbearance, and (3) injustice can be avoided only by enforcement of the promise.

*Neuhoff v. Marvin Lumber & Cedar Co.*, 370 F.3d 197, 203 (1st Cir. 2004).

These theories, as with tort claims generally, require proof of actual damages – here based on reasonable reliance on Raleigh's representations[17]

---

[17] The statements Rogatkin allegedly relied upon – "greatly increased support," "green light," and "golden life" – "fall[] within the ordinary rule that false statements of opinion, of conditions to exist in the future, or of matters promissory in nature are not actionable" as misrepresentations.

or promises.[18]  There is no evidence that Rogatkin was required by Raleigh to reject other (unspecified) sponsorship offers or that Rogatkin was contractually bound to represent Raleigh exclusively.  As Rogatkin himself admits, he did represent other companies, including KHE, his current primary sponsor, while still a member of Team Diamondback.  Without any showing of material damages, Raleigh is entitled to summary judgment on Counts IV, VI, and VII.

*Unjust Enrichment (Count V)*

Rogatkin alleges that Raleigh unfairly profited from his efforts to promote Raleigh (both by appearing in Raleigh advertising and competing

---

*Yerid v. Mason*, 341 Mass. 527, 530 (1960); *see also Deming v. Darling*, 148 Mass. 504, 505 (1889) (Holmes, J.).

[18] Under Massachusetts law, "as with a claim for breach of contract, [i]n order to establish the existence of an enforceable promise under promissory estoppel, the plaintiff must show that the defendants' promise included enough essential terms so that a contract including them would be capable of being enforced."  *Armstrong v. Rohm & Haas Co.*, 349 F. Supp. 2d 71, 82 (D. Mass. 2004) (internal quotation marks omitted).  Although Rogatkin alleges that Raleigh gave him assurances of future compensation, he cannot recall a specific number that was ever discussed.  General statements of optimism such as "greatly increased support," "green light" and "golden life" are simply too vague to form the basis of an enforceable promise.

with Team Diamondback) while compensating him minimally for his efforts. To establish a claim of unjust enrichment, Rogatkin must prove

> (1) a benefit conferred upon the defendant by the plaintiff;
> (2) an appreciation or knowledge of the benefit by the defendant; and
> (3) the acceptance or retention of the benefit by the defendant under circumstances which make such acceptance or retention inequitable.

*Stevens v. Thacker*, 550 F. Supp. 2d 161, 165 (D. Mass. 2008). Because unjust enrichment is a theory of equitable recovery, and not a separate cause of action, *Lopes v. Commonwealth*, 442 Mass. 170, 179 (2004), a court may not order restitution as a form of damages; it may only require a party to disgorge property that has been wrongfully appropriated from the rightful possession of the other party. *Santagate v. Tower*, 64 Mass. App. Ct. 324, 336 (2005).

The court here sees no inequity in any benefit that Raleigh may have derived from its association with Rogatkin. The undisputed evidence is that Rogatkin's relationship with Raleigh was voluntary from its inception and throughout. Rogatkin is an avid BMX athlete and he competed not only to promote Raleigh as his sponsor, but to also to gain experience and advance his standing in the world of BMX biking. Rogatkin was aware of Raleigh's use of his name and image in advertising and never objected for the obvious reason that he was a direct beneficiary of the publicity. He also benefitted

15

materially from the relationship in terms of equipment, gear, and travel expenses. If Rogatkin found the terms of his association with Raleigh unsatisfactory, he was free to renegotiate, or leave to pursue other opportunities (both of which he eventually did). Because Raleigh did not unfairly retain any benefit conferred by Rogatkin, Raleigh in entitled to summary judgment on Count V.

*Unfair and/or Deceptive Business Practices under Chapter 93A (Count II)*

Having found that Raleigh is entitled to summary judgment on all of the foundational claims, the court also finds that Raleigh is entitled to summary judgment on the unfair and deception business practices (Chapter 93A) claim. Rogatkin has not shown that Raleigh's actions fell within "the penumbra of some common-law, statutory, or other established concept of unfairness . . . or [was] immoral, unethical, oppressive or unscrupulous . . . [or] cause[d] substantial injury to consumers (or competitors or other businessmen)." *PMP Assocs., Inc. v. Globe Newspaper Co.*, 366 Mass. 593, 596 (1975).

ORDER

For the foregoing reasons, Raleigh's motion for summary judgment is <u>ALLOWED</u>. The claims against the John Doe defendants are also

16

DISMISSED.[19]  The Clerk will enter judgment for Raleigh and close the case.

                                          SO ORDERED.

                                          /s/ Richard G. Stearns

                                          _____
                                          UNITED STATES DISTRICT JUDGE

---

[19] This case was removed to this court in July of 2013. Fact discovery closed in April of 2014. Plaintiff has yet to identify and serve the John Doe defendants. "[A] district court otherwise prepared to act on dispositive motions is not obligated to wait indefinitely for [the plaintiff] to take steps to identify and serve . . . unknown defendants." *Figueroa v. Rivera*, 147 F.3d 77, 83 (1st Cir. 1998) (internal quotation marks omitted).